UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) 1:17-cr-00241-JMS-DML |
| *vs.* | ) |
| | ) |
| ZIAD I. KHADER (01), | ) |
| | ) |
| *Defendant.* | ) |

## ORDER

In December 2017, the Government charged Defendants Ziad Khader, Neil Patel, and Nikhil Patel with conspiracy to make false statements relating to health care matters, conspiracy to commit money laundering, and money laundering. [Filing No. 1.] Subsequently, the Government entered into Deferred Prosecution Agreements with Neil Patel and Nikhil Patel, and filed a Superseding Indictment against Mr. Khader, charging him with aiding and abetting health care fraud, aiding and abetting the making of false statements relating to health care matters, and aiding and abetting engaging in prohibited transactions. [Filing No. 124.] Several motions have been filed in advance of the March 15, 2021 trial in this matter, including Mr. Khader's Motion to Disqualify Neil Patel's Counsel, Patrick Cotter, and the law firm Greensfelder, Hemker & Gale, P.C. (the "Greensfelder Firm"). [Filing No. 135.] The Court held a video hearing on September 22, 2020 regarding the Motion to Disqualify, and the motion is now ripe for the Court's decision.

# I.
## BACKGROUND[1]

### A. Prior Representation of Nowscript and Related Companies by Thadford Felton, Patrick Cotter, and the Greensfelder Firm

*1. Medscript-Related Representation*

Mr. Khader, Neil Patel, and Nikhil Patel were part-owners of several compounding pharmacies. In 2013, Thadford Felton, a partner in the Greensfelder Firm, represented Mr. Khader, Neil Patel, and Nikhil Patel in the dissolution of their interests in a pharmacy called Medscript. Initially, Mr. Felton was the main point of contract at the Greensfelder Firm for any of the entities with which Mr. Khader was involved.

*2. Prior Lawsuits*

In 2014, a fourth member of Medscript filed a complaint against two pharmacies, Valuscript and My Script,[2] and against Mr. Khader, Neil Patel, Nikhil Patel, and another individual. Mr. Felton filed an appearance on behalf of those four individuals in that case. That is the only instance in which Mr. Felton represented Mr. Khader and the Patels. All of his other representations were of pharmacies with which those individuals were affiliated, and not the individuals. When Mr. Felton communicated with the pharmacies, his primary contact was Neil Patel. He also had some contact with Nikhil Patel, Mr. Khader, Joe Berri, and other individuals. Mr. Felton believed that if he was communicating with one individual, it was equivalent to

---

[1] The Court gleaned the bulk of the background information set forth in this Order from the September 22, 2020 video hearing, in which it heard testimony from Mr. Felton and Mr. Cotter, who were both questioned by counsel for Mr. Khader, counsel for the Government, and the Court. [[Filing No. 173](#).] The Court credits the testimony of Mr. Felton and Mr. Cotter as truthful.

[2] In some instances, the parties are inconsistent in naming certain pharmacies. For example, "My Script" is sometimes referred to as "Myscript" or "MyScript." The Court has used either the name of the entity found in the Superseding Indictment, or the name that appears most frequently in the parties' briefs.

communicating with all of the individuals collectively. Whenever Mr. Felton filed something in the case, it was on behalf of all of the individuals, not just on behalf of Mr. Khader or another individual defendant. None of the individual defendants ever indicated that there should be individual confidentiality. After the case was resolved, Mr. Felton believed that the individuals – including Mr. Khader – understood that Mr. Felton was representing the pharmacies and not the individuals going forward.

Mr. Felton also represented My Script and Valuscript on a claim brought by Medscript in federal court, and also represented those two pharmacies in an insurance coverage dispute.[3] Additionally, he represented those pharmacies in connection with restructuring the ownership of the pharmacies, responding to extensive due diligence requests for the potential sale of the pharmacies to different third parties, and drafting and reviewing nondisclosure agreements. For some of the pharmacies, Mr. Felton prepared various third party contracts and nondisclosure agreements with their employees, and he represented one of the pharmacies in connection with an Equal Employment Opportunity Commission complaint. He also assisted the pharmacies in responding to audits.

### 3. Amendment to Patel Khader, LLC Operating Agreement

Mr. Felton did not draft the operating agreements for Script LLC, My Script, or Valuscript, nor did anyone in the Greensfelder Firm, and Mr. Felton also was not involved in drafting any amendments to the operating agreements for those entities. He did participate in discussions with one or both of the Patels regarding why they were reflected as owners of Script LLC and not their

---

[3] In August of 2015, Medscript, My Script, and Nowscript – in which Mr. Khader, Neil Patel, and Nikhil Patel all had ownership interests – signed an engagement letter with the Greensfelder Firm. However, Mr. Felton provided legal advice to the pharmacies, through Mr. Khader and Mr. Patel, prior to the engagement letter.

wives, but those discussions related to an entity that had an ownership interest in one of the pharmacies. The Greensfelder Firm drafted an amendment to the operating agreement of Patel Khader, LLC, which reflected that the owners of that entity were Mr. Khader and the wives of Neil Patel and Nikhil Patel. Patel Khader, LLC had an ownership interest in Script LLC.

*4. Express Script's Audit of My Script for Retail Pharmacy Issue*

In 2015, Mr. Felton had discussions with several pharmacy benefit managers including CVS Caremark, AccessHealth, and Express Scripts (collectively, "the PBMs") responding to audits by those entities. Mr. Felton considered audits to be requests for information from a PBM, communications regarding the results of a PBM's review of that information, or a notice of suspension or notice of termination from a PBM.

My Script was notified in August 2014 that it was being terminated from Express Scripts because it was not a retail pharmacy. Mr. Felton became involved in representing My Script in connection with the Express Scripts audit in December 2014 or January 2015. Mr. Felton learned for the first time in December 2014 or January 2015 that the application My Script had submitted to Express Scripts indicated that it was a 100 percent retail pharmacy. Mr. Felton was not involved in My Script's application to Express Scripts. Mr. Felton did not recall sending an email to Mr. Khader, Neil Patel, and Nikhil Patel regarding whether My Script was a 100 percent retail pharmacy. Mr. Felton and the Greensfelder Firm also exchanged less than ten letters and emails with Express Scripts regarding the audit of My Script and the termination of My Script from the Express Scripts plan. Mr. Felton and the Greensfelder Firm tried to respond to Express Scripts' termination of My Script in the plan, and Express Scripts' belief that My Script was not following the terms of the plan agreement. Mr. Felton did not represent to any of the PBMs that the pharmacies were 100 percent retail in letters from him or the Greensfelder Firm.

### 5. *Audits Related to Collection of Copays*

Mr. Felton also communicated with CVS Caremark and Express Scripts regarding an issue with one or more of the pharmacies not collecting copays. His discussions with CVS Caremark were in the second half of 2014. CVS Caremark and Express Scripts claimed that the copay amounts were not being collected at the time of sale before the prescription was given to the patient, and Mr. Felton talked to the pharmacies about how to go about collecting the copays after the fact for the prescriptions that had already been sent because the pharmacies advised Mr. Felton that their clients would not pay the copays up front. Mr. Felton drafted a letter to send to patients who had already received their prescriptions, reminding them of their obligation to pay the copay. While he doesn't specifically recall doing so, he believes he would have discussed with the pharmacies the need to review their policies and procedures regarding collecting copays. In those discussions, Mr. Felton believes that one of the PBMs made a distinction between copays that were above and below $100, and does not recall whether the PBMs ever paid on some or all of the copays that were issued. Mr. Felton believes that he sent emails regarding the copay issue to Mr. Khader, Neil Patel, Nikhil Patel, and Joe Berri regarding either Script LLC, My Script, or Valuscript, and may have discussed the issue with Mr. Khader but likely had discussions with someone less senior than Mr. Khader. The emails and discussions related to how to go about collecting copays after patients had received their prescription. Mr. Felton recalls advising Mr. Khader that if the pharmacies were not collecting copays, then the attestation that they were doing so on the applications to the PBMs would be false.

### 6. *Additional Audits*

Mr. Felton was also involved in discussions between Nowscript and AccessHealth after AccessHealth informed Nowscript that it was being terminated from its plan in August 2015. Mr.

Felton does not recall what the basis for the termination was. Additionally, he was involved with an audit by Express Scripts of Nowscript which related to whether there were shortages between the drug supplies that had been purchased by Nowscript and the amounts used to fill prescriptions. After that issue was resolved, Express Scripts began asking questions in November 2015 about other pharmacies in which the owners of Nowscript might have been involved.

Mr. Felton did not have discussions with CVS Caremark regarding Script LLC, Valuscript, or My Script, but was involved in an audit by AccessHealth. Audits of Script LLC, Valuscript, and My Script were initially handled internally, and the pharmacies only came to Mr. Felton when AccessHealth threatened termination. Specifically, Mr. Felton was involved in appealing the termination of Nowscript from the AccessHealth plan.

### 7. *Assistance With Money Transfer*

In 2015, Mr. Felton and Mr. Cotter, also a partner at the Greensfelder Firm, assisted Mr. Khader in transferring $500,000 to an overseas account. The transfer had nothing to do with the pharmacies' operations or the charges in this case. In a letter the Greensfelder Firm sent to assist with the wire transfer, the Greensfelder Firm identified Mr. Khader as a client of the firm. Mr. Cotter believed that Mr. Khader was a client of the firm because the firm represented the pharmacies and Mr. Khader was one of the owners of the pharmacies.

### B. The Indictment

On December 6, 2017, the Government filed an Indictment charging Mr. Khader, Neil Patel, and Nikil Patel with conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. § 371, conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h), and six counts of money laundering in violation of 18 U.S.C. § 1957. [Filing No. 1.] The Indictment charged that Mr. Khader and the Patels used shell companies to hold ownership of

various compounding pharmacies, and enrolled Nowscript with the PBMs. [Filing No. 1 at 3.] It charged that the PBMs "screened and paid pharmacies on behalf of both commercial and federal health care benefit programs, including TRICARE, Federal Employee Program, Federal Employees Health, Government Employees Health Association, and many others." [Filing No. 1 at 3.] It further charged that the PBMs required Nowscript to complete provider certification or enrollment forms which asked for information about the operation and ownership of Nowscript, including the names of the owners, whether Nowscript was a mail order or a retail pharmacy, whether Nowscript used a sales force, and whether Nowscript waived or offered reductions in copays. [Filing No. 1 at 3-4.] The Indictment charged that Mr. Khader, Neil Patel, and Nikhil Patel mispresented information in the provider certification or enrollment forms, in violation of federal law. [Filing No. 1.]

### C. Involvement of Mr. Felton, Mr. Cotter, and the Greensfelder Firm in This Lawsuit and Joint Defense Agreement

Mr. Khader emailed and called Mr. Cotter after search warrants were executed in connection with this case, and advised Mr. Cotter that he had retained the law firm of Frier Levitt and Attorney Kendra Pannitti to represent him in this case. Mr. Khader and Mr. Cotter never discussed the Greensfelder Firm representing Mr. Khader in this case.

On December 22, 2017, Mr. Cotter entered an appearance on behalf of Neil Patel in this case. The Greensfelder Firm never obtained written consent from Mr. Khader for the firm to represent Neil Patel in this case, and Mr. Cotter did not believe that written consent was necessary. Mr. Khader never indicated to Mr. Cotter that he thought Mr. Cotter was acting as his counsel in this case. Mr. Cotter and the Greensfelder Firm also responded to subpoenas in this case on behalf of Nowscript.

Mr. Felton has not spoken to the Government about being a witness in this case. He understands that Mr. Khader, Neil Patel, and Nikhil Patel all agreed that the Greensfelder Firm would represent Neil Patel in this case, and that Mr. Khader and Nikhil Patel would retain other counsel. After Mr. Khader obtained separate counsel, he entered into a joint defense agreement with Neil Patel and Nikhil Patel. [Filing No. 157-1 at 3.] During that time, the Greensfelder Firm provided Mr. Khader's attorney with Mr. Felton's file, which he was able to review. [Filing No. 157-1 at 3.] The joint defense agreement "did not allow [Mr. Khader's] attorney at that time to pass information on to any subsequent counsel that [he] retained." [Filing No. 157-1 at 3.]

### D. The Deferred Prosecution Agreements and the Superseding Indictment

In October 2019, the Government entered into Deferred Prosecution Agreements with Neil Patel and Nikhil Patel. [Filing No. 96; Filing No. 97.] Subsequently, Mr. Khader filed a Petition to Enter Plea of Guilty, [Filing No. 108], and withdrew his guilty plea, [Filing No. 119], after which the Government filed a Superseding Indictment, [Filing No. 124]. The Superseding Indictment names only Mr. Khader as a defendant, and charges him with aiding and abetting health care fraud in violation of 18 U.S.C. § 1347, three counts of aiding and abetting false statements relating to health care matters in violation of 18 U.S.C. § 1035, and three counts of aiding and abetting prohibited transactions in violation of 18 U.S.C. § 1957. [Filing No. 124.]

## II.
## STANDARD OF REVIEW

A district court has a duty to "maintain public confidence in the legal profession and assist[] in protecting the integrity of the judicial proceeding." *Freeman v. Chi. Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir. 1982). Additionally, "[i]t is well-settled…that a criminal defendant's right to his chosen attorney may be outweighed by a serious potential for conflict due to the attorney's prior representation of other defendants charged in the same criminal conspiracy."

- 8 -

*United States v. Algee*, 309 F.3d 1011, 1013 (7th Cir. 2002). That said, "[d]isqualification [of counsel] is a 'drastic measure' that should not be imposed lightly." *Andersen v. Vill. of Glenview*, 821 Fed. App'x 625, 629 (7th Cir. 2020) (quoting *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993)).

## III.
### DISCUSSION

Mr. Khader seeks to disqualify the Greensfelder Firm and Mr. Cotter from representing Neil Patel in this matter, setting forth various arguments which the Court discusses in turn below.

### A. Indiana Rule of Professional Conduct 3.7 – Lawyer As Witness

Mr. Khader first argues that Rule 3.7 of the Indiana Rules of Professional Conduct mandates disqualification of Mr. Cotter and the Greensfelder Firm from representing Neil Patel because Mr. Felton is likely to be a necessary witness in Mr. Khader's trial. [Filing No. 135 at 6.]

The Greensfelder Firm and Mr. Cotter respond that Rule 3.7 only prohibits a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a witness, and Neil Patel is no longer a party because of the Deferred Prosecution Agreement so Mr. Cotter "could not be an advocate at the trial." [Filing No. 148 at 6.] Additionally, they argue that Mr. Felton has not entered an appearance for Neil Patel, so would not be an advocate for him at trial. [Filing No. 148 at 6.] The Greensfelder Firm and Mr. Cotter also argue that Rule 3.7(b) states that when a lawyer is prohibited from being an advocate at trial, another lawyer at the firm may serve as an advocate unless another rule precludes him or her from doing so. [Filing No. 148 at 6.] Finally, they contend that it is unlikely Mr. Felton would be a necessary witness, noting that Mr. Khader does not provide any evidence that this is the case, and that "evidence relevant to issues of ownership is largely documentary and in the possession of Mr. Khader and others." [Filing No. 148 at 6.]

Mr. Khader does not address Rule 3.7 in his reply brief. [Filing No. 157.]

Rule 3.7 of the Indiana Rules of Professional Conduct provides:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Ind. R. Prof'l Conduct 3.7.

The plain language of Rule 3.7 does not apply to the circumstances of this case. First, Mr. Cotter and the Greenfelder Firm will not be acting as an advocate at Mr. Khader's trial because Neil Patel is not going to trial. And, to the extent that Mr. Cotter acts as an advocate for Neil Patel if Mr. Patel testifies at Mr. Khader's trial, there is no evidence that Mr. Cotter is "likely to be a necessary witness." Ind. R. Prof. Conduct 3.7. Indeed, Rule 3.7(b) specifically allows Mr. Cotter to act as an advocate at Mr. Khader's trial even if Mr. Felton were to be called as a witness.[4] Rule 3.7 does not preclude Mr. Cotter from representing Neil Patel in this case.

### B. Indiana Rule of Professional Conduct 1.7 – Conflict of Interest: Current Clients

Mr. Khader cites to Rule 1.7 of the Indiana Rules of Professional Conduct, but does not discuss how it applies to the circumstances of this case. [Filing No. 135 at 6-7.]

---

[4] As discussed below, Rules 1.7 and 1.9 do not preclude Mr. Cotter from representing Neil Patel in this matter even if Mr. Felton were likely to be called as a witness at Mr. Khader's trial.

The Greensfelder Firm and Mr. Felton argue that Rule 1.7 addresses conflicts between two current clients of the attorney, so does not apply here because Mr. Khader is not a current client of the Greensfelder Firm.  [Filing No. 148 at 5-6.]

Mr. Khader does not address Rule 1.7 in his reply brief.  [Filing No. 157.]

Rule 1.7 provides that:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Rule 1.7 does not apply because it is undisputed that Mr. Khader is not a current client of the Greensfelder Firm or Mr. Cotter.  Accordingly, there is no concurrent conflict of interest.

### C. Indiana Rule of Professional Conduct 1.9 – Duties to Former Clients

Mr. Khader cites Rule 1.9 and argues that Mr. Felton had a relationship with Nowscript and other pharmacies in which Mr. Khader was involved, and also had an attorney-client relationship with Mr. Khader.  [Filing No. 135 at 7-8.]  He asserts that "[t]traditionally, counsel for an organization explains to individuals of a company that the organization alone is his client…[but h]ere, Mr. Felton did the opposite when he explicitly said that Mr. Khader was his client, thus fostering Mr. Khader's belief that Mr. Felton was also representing him individually during his work for Nowscript and the other pharmacies that Mr. Felton represented."  [Filing No. 135 at 8.]  Mr. Khader argues that, since Mr. Felton established an attorney-client relationship with him, the Greensfelder Firm cannot represent Neil Patel in "the same or [a] substantially related matter when their interests are materially adverse to Mr. Khader's."  [Filing No. 135 at 10.]  Mr.

Khader contends that the matters are substantially related because Mr. Felton could have obtained confidential information in the first representation that is potentially relevant to the second representation. [Filing No. 135 at 10.]

In their response, the Greensfelder Firm and Mr. Cotter argue that "this situation involves a prior joint representation, followed by a representation of one of the parties to the joint representation," and that Mr. Khader does not cite any legal authority precluding Mr. Cotter from representing Neil Patel under these circumstances. [Filing No. 148 at 7 (emphasis omitted).] They argue that the Court must first reconstruct the scope of the prior legal representation, and then determine whether it is reasonable to infer that the attorney received confidential information in connection with the prior legal representation, then determine whether that information would be pertinent to the issues in the pending matter. [Filing No. 148 at 7.] The Greensfelder Firm and Mr. Cotter argue that Mr. Khader has not provided any information on the nature and scope of the prior legal representation, and has not submitted any evidence supporting the notion that Mr. Felton counseled Mr. Khader in completing the pharmacy benefit manager applications. [Filing No. 148 at 8.] They assert that Mr. Felton's alleged representation of Mr. Khader in the 2014 Medscript case – which involved allegations that Mr. Khader, Neil Patel, Nikhil Patel, and others obtained and used patient information from a competing pharmacy to induce the patients to become customers of their pharmacies – was "completely unrelated to the criminal case now before the Court." [Filing No. 148 at 8.] The Greensfelder Firm and Mr. Cotter argue that it is not reasonable to infer that Mr. Felton received confidential information from Mr. Khader, or information that was confidential as to Neil Patel, because Mr. Khader asserts that Mr. Felton represented him and Neil Patel jointly in the prior representation. [Filing No. 148 at 8-9.] They note that the interests of Mr. Khader and Neil Patel were aligned in the previous representation, so

"[t]here is no factual or legal basis upon which to infer that Mr. Khader would have shared any information with Attorney Felton that was confidential as to Mr. Patel." [Filing No. 148 at 9.] Finally, the Greensfelder Firm and Mr. Cotter argue that Mr. Khader only asserts that the allegedly confidential information shared in the prior representation has "potential" relevance in the second matter, but the standard is whether it "would materially advance" Neil Patel's position in the second matter – and Mr. Khader has not argued that this standard is met. [Filing No. 148 at 10-11.]

In his reply, Mr. Khader argues that whether the Greensfelder Firm has entered an appearance for Mr. Khader in this case is irrelevant, because Rule 1.9 contemplates an attorney's duty to a former client when dealing with a substantially related matter. [Filing No. 157 at 2.] Mr. Khader also argues that "upon having his house raided and searched by the Government in preparation for this case, Mr. Khader reached out to [the Greensfelder Firm] and received guidance from Mr. Cotter until he retained his own counsel." [Filing No. 157 at 2.] He asserts that under Rule 1.9, the confidential information exchanged need not relate to Neil Patel, but rather the rule "prohibits an attorney from representing a current client when they represented a former client in a substantially related matter when the two clients have materially adverse interests." [Filing No. 157 at 3.] Mr. Khader contends that he and Neil Patel have materially adverse interests here because his interest is to be acquitted of all charges and Neil Patel's interest is "to help the Government convict Mr. Patel by testifying against him at trial in order to receive a deferred prosecution." [Filing No. 157 at 3.] Finally, Mr. Khader reiterates his arguments that the two matters are substantially related. [Filing No. 157 at 3-4.]

Rule 1.9 provides that:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

- (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

    (1) whose interests are materially adverse to that person; and

    (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

- (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

    (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

    (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Rule 1.10 imputes the conflict of interest rules to all attorneys in a firm. *See* Ind. R. Prof'l Conduct 1.10 ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2…."). Subpart (a) of Rule 1.9 could apply to Mr. Cotter's representation of Neil Patel if that representation and Mr. Felton's prior representation of Mr. Khader are considered "substantially related." Two matters are "substantially related" when they "involve the same transaction or legal dispute," or when there is a "'substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.'" *Watkins v. Trans Union, LLC*, 869 F.3d 514, 520 (7th Cir. 2017) (quoting Ind. R. Prof'l Conduct 1.9, cmt. 3).

The Court credits the testimony of Mr. Felton that he represented Mr. Khader individually only in connection with the 2014 lawsuit brought against Medscript, Mr. Khader, Neil Patel, Nikhil Patel, and others. Additionally, even if Mr. Khader believed that Mr. Felton represented him

individually in connection with the PBM audits and other matters related to the pharmacies, his subjective belief is not sufficient to establish an attorney-client relationship. *Pearlshire Cap. Grp, LLC v. Zaid*, 2020 WL 5800815, at *7 (N.D. Ill. 2020) ("An individual's subjective belief that he is represented is not alone sufficient to create an attorney-client relationship"). The 2014 lawsuit involved allegations that Mr. Khader, Neil Patel, Nikhil Patel, and others obtained and used patient information from a competing pharmacy to induce individuals to become customers of their pharmacies. That has nothing to do with the allegations which underlie this case, and the Court finds that the 2014 lawsuit and this case are not "substantially related" because they did not involve the same transaction or legal dispute, nor is there a "substantial risk that confidential information [from] the prior representation would materially advance" Neil Patel's position in this matter. *Watkins*, 869 F.3d at 520.[5]

In short, Rule 1.9, applicable to the entire Greensfelder Firm through Rule 1.10, does not preclude Mr. Cotter from representing Neil Patel in this matter because Mr. Felton's prior representation of Mr. Khader is limited to the 2014 lawsuit – a matter which is not substantially related to this case.

---

[5] After the September 22, 2020 video hearing on the Motion to Disqualify, Mr. Khader submitted a June 1, 2015 letter from Mr. Cotter to a Banking Advisor at PNC Financial Services Group in which Mr. Cotter stated that Mr. Khader was a client of the Greensfelder Firm and that he was assisting Mr. Khader in making an international wire transfer to a bank in Jordan. [Filing No. 172-2.] Even assuming that the letter shows that Mr. Cotter was representing Mr. Khader as his counsel, the matter in which he was representing him is not "substantially related" to Mr. Cotter's representation of Neil Patel in this case – indeed, it is wholly unrelated. Also, after the September 22, 2020 video hearing, Mr. Khader submitted a January 28, 2015 email from Mr. Felton to Mr. Khader, Neil Patel, and Joe Berri. After reviewing the email, the Court concludes that it was written in Mr. Felton's capacity as counsel to the pharmacies, and not as counsel to Mr. Khader individually. [*See* Filing No. 172-1.]

### D. Arguments Raised by the Greensfelder Firm and Mr. Cotter

The Greensfelder Firm and Mr. Cotter argue that Mr. Khader's Motion to Disqualify is untimely and that Neil Patel would be severely and unfairly prejudiced by disqualification of his counsel. [Filing No. 148 at 11-15.] Although the Court has already determined that none of the grounds raised by Mr. Khader requires Mr. Cotter's disqualification, it briefly considers these remaining arguments.

#### 1. *Timeliness of the Motion*

The Greensfelder Firm and Mr. Cotter argue that a motion to disqualify should be made with reasonable promptness after a party discovers the facts supporting the motion. [Filing No. 148 at 11.] They assert that Mr. Khader waited nearly three years after the case was filed, and nearly one year after Neil Patel entered into a Deferred Prosecution Agreement, to file his motion, and that Mr. Khader does not set forth any reason for the delay. [Filing No. 148 at 11-12.]

Mr. Khader argues in his reply that while the joint defense agreement was in effect, Mr. Cotter and the Greensfelder Firm provided information, including Mr. Felton's file, to Mr. Khader and his previous counsel. [Filing No. 157 at 4.] He contends that "once Mr. Patel entered into the deferred prosecution agreement and…current counsel for Mr. Khader found out that now Greensfelder, through Attorney Felton, would no longer cooperate with Mr. Khader and his counsel," filing the motion became necessary. [Filing No. 157 at 4.]

"A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Kafka v. Truck Ins. Exch.*, 19 F.3d 383, 386 (7th Cir. 1994) (quotation and citation omitted). Mr. Khader's motion is based on Mr. Felton's alleged representation of him in 2014 and his subsequent representation of the pharmacies. While Mr. Khader's difficulties with obtaining information from Mr. Felton and the Greensfelder Firm may

not have arisen until more recently, the basis for his motion – the past representations – has been known to him since Mr. Cotter entered an appearance for Neil Patel in this matter on December 22, 2017 – nearly three years before Mr. Khader filed the Motion to Disqualify. The Court has already found that Mr. Khader has not presented any legal grounds warranting Mr. Cotter's disqualification from representing Neil Patel in this matter, and finds that Mr. Khader's motion should also be denied because it is untimely.

### 2. *Potential Prejudice to Neil Patel*

The Greensfelder Firm and Mr. Cotter also argue that Neil Patel would be "severely disadvantaged were he now, at the most critical part of this years-long case, deprived of the services of [Mr. Cotter] who is, at this point in the history of [Neil] Patel's case, uniquely qualified to best protect Neil Patel's interests." [Filing No. 148 at 14.] They note that Mr. Cotter is the only attorney who has entered an appearance for Neil Patel in this case, that he has spent many hours on his representation of Neil Patel in this case, and that he "has been, and expects to continue to be, involved in every step of Neil Patel's truthful cooperation and preparation to testify, if called, at the trial against [Mr. Khader]…." [Filing No. 148 at 14-15.]

Mr. Khader argues that even though Neil Patel may still be a defendant in this matter, "the conflict presented by Greensfelder's former representation of Mr. Khader overcomes any presumption favoring chosen counsel under the Sixth Amendment," and Mr. Patel's "interests are severely dwarfed by those of Mr. Khader because Mr. Patel is not facing the multitude of charges that Mr. Khader faces…." [Filing No. 157 at 5.]

> The Court recognizes the Seventh Circuit's observation that:
>
> [G]ranting a motion for disqualification has "immediate, severe, and often irreparable…consequences" for the party and disqualified attorney. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 719 (1982). Disqualifying a lawyer immediately deprives the losing party from the "representation of his choice" and

- 17 -

> disrupts the litigation. *Id.* In sum, "disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary…[because it] destroy[s] a relationship by depriving a party of representation of their own choosing." *Id.* at 721.

*Watkins*, 869 F.3d at 519. The Court is also mindful that motions to disqualify "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman*, 689 F.2d at 722.

Given that Mr. Felton and Mr. Cotter represented Mr. Khader individually in a very limited capacity in 2014 and 2015, in unrelated matters, the Court finds that disqualifying Mr. Cotter would be an unwarranted limit on Neil Patel's right to have counsel of his choosing to represent him in this matter. Disqualification would be a "drastic measure" that the Court is unwilling to impose.[6]

In sum, the Court finds that Mr. Felton's limited representation of Mr. Khader individually in a 2014 lawsuit – which the evidence shows was his only representation of Mr. Khader individually – does not warrant disqualification of Mr. Cotter from representing Neil Patel in this matter. Further, Mr. Khader's Motion to Disqualify is untimely and disqualification of Mr. Cotter would be prejudicial to Neil Patel. Accordingly, the Court **DENIES** Mr. Khader's Motion to Disqualify Patrick Cotter and the Greensfelder Firm. [Filing No. 135.]

---

[6] The Greensfelder Firm and Mr. Cotter also assert that the Motion to Disqualify was only filed after the Greensfelder Firm refused to produce the corporate clients' legal files and after Mr. Felton refused to speak with Mr. Khader's counsel regarding his representation of Nowscript. [Filing No. 148 at 12-13.] They argue that the circumstances presented here indicate that the motion "has the earmarks of being the product of the type of improper purpose that the case law warns against." [Filing No. 148 at 14.] The Court need not consider this argument, given its denial of Mr. Khader's Motion to Disqualify on other grounds.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Khader's Motion to Disqualify Patrick Cotter and the Greensfelder Firm. [135.] Mr. Cotter and the Greensfelder Firm may continue to represent Neil Patel in this matter.

Date: 11/18/2020

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**